### MAGEE v. MISSOURI, K. & T. RY. OF TEXAS. (No. 6408.)

(Court of Civil Appeals of Texas. San Antonio. May 19, 1920.)

Carriers ⬳328(2)—Railroad not liable for injury to one attempting to board train on side on which passengers were not being received.

Railroad company *held* not liable for loss of leg, through sudden movement of its train, of one who claimed he came to its depot to meet a brother coming in on a train, where the injured man was hurt by an outgoing train while seeking to enter it, not from the side where passengers were boarding it, where there was a platform, but from the other side, where there was no platform, no lights, and the doors to the train were closed.

Appeal from District Court, Bexar County; J. T. Sluder, Judge.

Action by Wirt Magee against the Missouri, Kansas & Texas Railway of Texas. From a judgment for defendant, plaintiff appeals. Affirmed.

J. D. Childs, of San Antonio, for appellant.

F. C. Davis, of San Antonio, C. C. Huff, of Dallas, and Marshall Butz, of San Antonio, for appellee.

FLY, C. J. Appellant instituted this suit against appellee for damages arising from the loss of a leg through the negligence of appellee in suddenly moving a train, without notice or signal, into which he was endeavoring to enter. After hearing the evidence the court instructed a verdict for appellee, which was accordingly returned by the jury, and judgment rendered thereon.

There is but one assignment which necessitates a review of all the testimony, at least that could be considered favorable to the claim of appellant. The only important witness for appellant was appellant himself, the propriety or impropriety of the peremptory instruction resting on whether his testimony could possibly form the basis for a verdict in his favor. He was corroborated in the assertion that he was a drafted soldier; that he was away from camp on a pass; and that in some way he was so injured, in the yard of appellee, on the night of December 9, 1917, that he lost one of his legs.

He stated that he went to the passenger depot of appellee between 8 and 9 o'clock on the night of December 9, 1917, to meet a sick brother, who had written him a letter. The letter was not shown, nor did the sick brother testify, although it transpired that the brother was not on the train and did not come to San Antonio for two months after the accident. He stated that he went to the depot to assist the sick brother off the train with his baggage, and went to the window and asked the agent if there was a train in, and he said, "Yes." He then went out the door of the station and saw three or four trains standing there and—

"a fellow standing there, looked to be a railroad man, and I asked him if the train was in; I asked him if he was in charge of the railroad; I told him I had a sick brother on there and I wanted to help him off with his baggage and he just says, 'Go ahead.' I asked him if it was a Katy train and I went on out. This fellow I saw standing there was telling the railroad people to do this and that around there."

He further testified:

"Yes; I asked him which was the Katy train. And I went on down the side of the train looking in the windows there, and I saw a fellow that I knew, Evans Wilkinson, a friend of mine and my brother's, and I thought by seeing him on there that maybe my brother was on there too, with him. So I started to get on the train, and just as I started to get on, got my foot up there, the train kind of moved up quick and I got unbalanced some way up there, which throwed me, and I rolled and my foot somehow got under the wheel there—I don't know just exactly how it was—and just cut it off right there. The train was standing still when I went to step on it. Just as I started to get up on the step—I had my foot up there— the train moved up and throwed me. I rolled

and got my foot under the train. The train was a passenger train. My purpose in going on that train was to help my brother off and see Evans Wilkinson. I wanted to see Evans Wilkinson about some business. I wanted to see him; also I wanted to see both of them. * * * When I stepped up on the steps there was nothing occurred to indicate or warn me that the train was going to move. Nothing like a bell or whistle or the conductor or anything like that."

Appellant swore that there was no one at or near the train when he undertook to board it, and that there were no platforms. He said "a fellow" pointed out the train to him. He swore that there were no platforms "no steps, no box, or anything to get in on," and he did not know whether he was on the east or west side of the train. He also testified that he saw no one on the side of the train on which he tried to climb. When examined by the court, appellant testified:

"Yes, sir; I have been down there since the accident and I saw these platforms there where passengers get on. There are platforms there between the tracks where people get on and off. There wasn't any platform on the side of the train I attempted to get on. It wasn't up against the platform. I don't know whether the other side of the train was up against the platform or not."

He also said there were no platforms, but cement sidewalks.

The uncontradicted testimony of appellee showed that appellant was hurt by an outgoing train that left about 9 o'clock p. m. Passengers boarded the train on the west side, where there was a platform, but there was no platform on the east side. San Antonio is a terminal for appellee, and the trains go no further than the place in the yard near the depot where appellant was hurt. All trains come in from and go out in a southerly direction. The train which hurt appellant was the first section of No. 26, the "Katy Flier." An employé of appellee swore, and he was not contradicted, that when the first section moved out he was standing on the platform west of the train, and he heard a groan and scream on the east side and as soon as the train passed he crossed over the track and he and two soldiers picked appellant up, carried him across the track, and laid him on the platform. There were a large number of people on the platform at that time. There was no platform nor lights on the east side of the train and the doors were closed. Others testified to seeing blood on the east side of the track, where passengers were never received. It was made of gravel and rocks between the tracks, and was not for ingress or egress.

Appellant did not know on which side of the train he sought to enter, but he knew there were no platforms and steps there. Although a passenger train was preparing to leave, he swore that there was not a human being on the side of the train where he was hurt. He said: "I didn't see anybody there at this place where I attempted to get on—passengers or anybody else." He was looking for a train discharging passengers, yet no one was there, and to convince him that he was not at a train delivering passengers he says he saw a friend in one of the cars, who it seems was not there and consequently could not have disembarked. The man he saw must have left on the train. If he received a letter from his sick brother, it was not produced, and the brother not only did not come at that time but did not testify at the trial and no effort was made to obtain his deposition, although his residence in Texas was well known to appellant. No human being corroborated a single statement made by him except that he was hurt and had a pass on his person. No letter was found in his pocket. Wilkinson was not in San Antonio that night, nor was his brother there. No one else has intimated that the brother was sick when the accident occurred. There was no evidence as to when any train came in on the night in question. If appellant did ask any one about the train that had come in, he did not indicate who it was. He did not swear that "the fellow" wore any uniform or badge, nor how he knew the men he was ordering around were railroad men. His testimony alone shows that he could not have been on the side of the train where people entered or left the cars, and in fact he stated he saw no one entering or leaving. The only reasonable way to account for the absence of every one on the side of the train where he was hurt was that he had for some purpose of his own gone on the dark side, where there was no platform and where he was a trespasser.

If he was a licensee on the premises to help his brother off a train that had just come in, that did not license him to endeavor to enter an outgoing train; and appellee would not be liable unless some agent of the company had induced him to attempt to board it, or knew of his position of danger and with such knowledge gave no notice of the intention to move. All the facts go to show that no one showed him the outgoing train and told him that it was the one which had just come in, and all the facts tend to show that he was not trying to board the train where any one would expect him to make such endeavor.

Appellant does not pretend that any one, whether connected with the train or not, knew he was trying to get on the train that was about to leave for the north. He made it impossible for any one to have seen him, for he reiterated that there was no one on that side of the train. It is utterly incredible that any one told him that train had just come in, and any one of the most ordinary intelligence should have known that if the train had just come in persons would be getting off. No one was getting off. No one was getting on, and

consequently it is certain appellant was not on the side of the train where people got on. He was undoubtedly found on the east side of the train, where he had no right to be. Four trains were standing on the different tracks in the yard.

The movement of the train was not shown to be negligent. Every quick movement of a train is not negligent, and it was not shown that appellee knew that appellant was in a place where movement of the train would injure him. Appellant gave no description of the train by the time it was due or in any way identified it, but asked if the "Katy train" was in and was told it was. There may have been several that had come in.

The cases cited by appellant as to due notice to those who, he says, go to trains "to welcome the coming or speed the parting guest," refer to parties going at train time to depots to place relatives or friends on trains or to assist them off, and not to a person going on the side of a train where no one can see him, and where no one gets off or on. He was not licensed to go to any such place. If he had gone to the proper train, on the platform side, at the time when it arrived, to assist his brother to alight, he was a licensee, and appellee would have owed him ordinary care in his protection. But when he entered the yards and wandered off to a train going out, on the side where no one got off or on, without the knowledge of appellee, it owed him no duty. Appellee was under no obligation to provide a guide or bodyguard to prevent appellant from wandering into places where reason and common sense should have taught him he should not go.

The judgment is affirmed.